FILED
2026 Sep-10 PM 01:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MITZI D. PITZING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:24-cv-1465-GMB |
| | ) | |
| UAB MEDICINE ENTERPRISE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Mitzi D. Pitzing filed an amended complaint against her former employer UAB Medicine Enterprise ("UAB") alleging a gender-based hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and interference and retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*. Doc. 5. The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 13. Before the court is UAB's Motion for Summary Judgment. Doc. 20. The motion is fully briefed (Docs. 21, 26 & 27) and due to be granted.

## I. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The purpose of summary judgment is to

separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II. STATEMENT OF FACTS[1]

Jean Ann Larson, Chief Leadership Development Officer at UAB, hired Pitzing as an Executive Assistant in December 2016. Doc. 22-1 at 8–9; Doc. 22-5 at

[1] Some of the material facts are in dispute, and the court notes those disputes where appropriate. And even though the court discusses some disputed facts, the court credits only Pitzing's version.

2. In August 2019, Pitzing had back surgery. Doc. 22-1 at 26. She requested FMLA leave, completed the required form, and UAB approved the leave. Doc. 22-1 at 26–27. Then, in the fall of 2020, Pitzing received a breast cancer diagnosis. Doc. 22-1 at 12. Because this came during the COVID-19 pandemic, Larson told Pitzing to continue working from home and to take paid time off as needed. Doc. 22-1 at 31. Larson did not suggest FMLA leave, and Pitzing did not speak to the benefits department to obtain FMLA leave. Doc. 22-1 at 31 & 37. Instead, Pitzing believed that Larson expected her to continue to work. Doc. 22-1 at 37.

### A. Work Environment

According to Pitzing, Larson's "toxic" and "derogatory" treatment of others resulted in a hostile work environment. Doc. 22-1 at 15. Pitzing explained that Larson made negative comments about "stakeholders, . . . other colleagues, it was comments about people across the organization." Doc. 22-1 at 15; *see also* Doc. 22-1 at 21. For example, Pitzing testified that "when we met with someone, and then there would immediately be discussions about an individual that were toxic and derogatory. . . . And it made it very difficult to work in that environment." Doc. 22-1 at 15.

Larson also made comments about or to Pitzing. Doc. 22-1 at 15. Larson repeatedly criticized Pitzing's ex-spouse. Doc. 22-1 at 16. During one conversation, Pitzing and Larson were discussing the need for Pitzing to take time off because of

her divorce. Doc. 22-1 at 16. During this discussion, Larson told her to "pick a better partner." Doc. 22-1 at 16. Pitzing believed Larson made this comment because Pitzing was in a relationship with a woman. Doc. 22-1 at 16. Pitzing explained that the tone of the conversation made her believe that Larson meant that she should "pick a male partner" even though she did not use those words. Doc. 22-1 at 19–20. Pitzing "felt [Larson] would have been more empathetic [if] it was a normal relationship, instead of being so derogatory. But [she] felt because [she] was in a lesbian relationship, married to a woman, [Larson] was more opinionated." Doc. 22-1 at 16.

Pitzing gave another example of Larson's comments: she told Pitzing at least twice to "stop taking care of her children." Doc. 22-1 at 17–18. Pitzing explained that Larson made these comments when her oldest daughter, who has Type I diabetes, needed Pitzing's help on two occasions—once when she was in college and once when she was looking for an apartment after college. Doc. 22-1 at 17–18, 20. Pitzing believes these comments related to her gender because she "had kids, and that's a problem." Doc. 22-1 at 18.

Pitzing testified that Larson's derogatory comments made her feel vulnerable and she thought that Larson made them "just to tear [her] down." Doc. 22-1 at 75. Pitzing did not report these statements or any others to anyone because she feared that Larson would retaliate against her. Doc. 22-1 at 18 & 26.

**B. Pitzing's Job Performance**

In November 2021, Larson promoted Pitzing to Executive Assistant II and Program Director. Doc. 22-1 at 13; Doc. 22-5 at 15. Larson and Pitzing collaborated to create a job title and description for the new position. Doc. 22-1 at 14; Doc. 22-5 at 2. Pitzing assumed greater responsibilities than those associated with her previous role, including the planning, organizing, and executing of events. Doc. 22-5 at 2; Doc. 22-2 at 26. UAB gave Pitzing a raise when she assumed her new duties. Doc. 22-1 at 13–14.

After the promotion, Larson noticed deficiencies in Pitzing's organizational abilities. Doc. 22-5 at 3. According to Larson, Pitzing inefficiently responded to requests for meetings, left out necessary participants in Zoom meetings, and neglected to update Larson's calendar. Doc. 22-5 at 3–4. And in May 2022, Pitzing struggled to create a participant directory for UAB's annual Leadership Institute. Doc. 22-5 at 4. Because the task was "neither . . . difficult nor . . . time-consuming," Larson "became frustrated with the amount of time it was taking [Pitzing], so [she] removed the project from [Pitzing] and asked [her] husband to assist in gathering and organizing the information." Doc. 22-5 at 4.

According to Larson, she counseled Pitzing on multiple occasions about her work deficiencies, including meetings in May, August, and September of 2022.

Doc. 22-4 at 7; Doc. 22-3 at 17–18, 25–26. Larson documented[2] their conversations with memos addressed to Pitzing detailing "instances of concern" and providing bullet-pointed lists of expectations. Doc. 22-3 at 17–18, 25–26. Pitzing denies that these conversations occurred and that she received this documentation. Doc. 22-1 at 46, 49–50. She does admit, however, to having a discussion with Larson about one of the items on the expectations list—that she work from the office at least four days per week. Doc. 22-1 at 47.

Then, on September 28, 2022,[3] Pitzing met with Larson for a performance review. Doc. 22-1 at 50; Doc. 22-3 at 28. As soon as Pitzing arrived, Larson told her the review would "be a hard one to swallow." Doc. 22-1 at 50. Larson rated Pitzing as "met some expectations" in the "Core Values" section of the review. Doc. 22-3 at 30. Larson noted her concerns about Pitzing's "negativity" and stated that she failed to meet expectations when it came to "ownership," explaining that "she drops the ball [and] she is quick to blame others and reluctant to problem solve" when "something goes wrong." Doc. 22-3 at 30. Larson noted "one of [her] biggest disappointments" as repeated mistakes "despite multiple conversations." Doc. 22-3 at 30. Larson gave Pitzing an overall rating of "Failed to Meet Expectations" and

---

[2] The last document has a signature line with the parenthetical "I have seen this document." Doc. 22-3 at 27. It is not signed.

[3] Pitzing testified that the performance review took place in late September. Doc. 22-1 at 50. But Larson electronically signed the document on October 24, 2022, and Pitzing electronically signed it on November 1, 2022. Doc. 22-3 at 32.

explained that she struggled to meet the expectations of her "dual role" as Program Director/Executive Assistant, including "different types of organization skills required for this job and the ability to think and work proactively." Doc. 22-3 at 30. Larson again noted repeated mistakes "despite several conversations" with Pitzing.[4] Doc. 22-3 at 30.

In the final section of the review, Larson listed expectations for Pitzing "to perform her job at the level of met expectations." Doc. 22-3 at 31. Those items included (1) "develop[ing] processes, standard operating procedures and checklists to allow her to effectively manage our program from start to finish"; (2) "demonstrat[ing] the ability to execute on the cadences and ensure that the department's workload is planned and flows smoothly"; (3) "reconfigur[ing] and reset[ting] her organization and follow up processes"; (4) "own[ing] her own responsibilities . . . without blaming or making excuses" and "employ[ing] problem solving and the exploration of options in order to find a solution and move forward"; (5) "effectively communicat[ing] and coordinat[ing] efforts with the program coordinator"; and (6) attendance "in the office 5 days a week from 8:30 to 5:00." Doc. 22-3 at 31. Pitzing testified that the review caught her "off guard because there had not been any comments made to [her] prior that there was anything wrong."

[4] Pitzing's comments in this area, made before she saw her review (Doc. 22-1 at 51), include her "[a]ppreciat[ion] of the feedback . . . in expectations for [her] new position" and the admission that some things "could be done a better way." Doc. 22-3 at 31.

Doc. 22-1 at 51.

Larson's concerns about Pitzing's work continued, and Pitzing received a written counseling notice on January 30, 2023. Doc. 22-3 at 42. Many of the issues outlined in the counseling notice were the same as those discussed during her performance review. For example, the notice listed three concerns, including a need for improvement in her organization skills, better consistency in meeting deadlines and requirements, and the need "to take action and make decisions with a high degree of independence." Doc. 22-3 at 42. It listed similar expectations with specific examples for improvement and implementation. Doc. 22-3 at 42. Finally, the notice gave Pitzing an action plan for the next 90 days. Doc. 22-3 at 42.

Pitzing signed the counseling notice, agreed that the expectations were fair, and believed that the action items were appropriate for her position. Doc. 22-1 at 56. However, Pitzing testified that she "did everything [Larson] asked of [her]" and completed many of the action items they discussed. Doc. 22-1 at 56–57. She testified that "[t]here were a lot of things that [Larson] never even asked [her] to do but was holding [her] accountable for." Doc. 22-1 at 56.

**C. Pitzing's Injury on January 31, 2023**

The next day—Tuesday, January 31—Pitzing suffered an on-the-job back injury. Doc. 22-1 at 57. She continued to work that day but notified Larson of her injury on the following morning. Doc. 22-1 at 57. Larson completed a workers'

compensation report and Pitzing received treatment later that day. Doc 22-1 at 57–58; Doc. 22-3 at 44. The physician cleared Pitzing to return to work with restrictions. Doc. 22-1 at 58.

Pitzing returned to work the next day, which was Thursday, February 2. That afternoon, however, she went back to the doctor and received new instructions not to work until she could be fully evaluated, including an MRI. Doc. 22-1 at 58. She did not work on Friday. On Sunday, February 5, Pitzing sent a text message to Larson reporting that her back was "much, much better" and that she was "able to walk and be normal." Doc. 22-1 at 58; Doc. 22-3 at 46.

Even though she had not been cleared to work by a physician, Pitzing returned to work on Monday, February 6, because Larson required her to attend a strategic planning retreat in the office. Doc 22-1 at 58–59. When a benefits administrator contacted Pitzing that day to ask if a doctor released her to return to work, she responded that the doctor was out of town but she was able to work. Doc. 22-1 at 59. Pitzing apparently worked the remainder of that week. But on Friday, February 10, her back spasmed while she was working in her office, causing her to fall out of her chair. Doc. 22-1 at 61. A coworker helped her to her car in a wheelchair, and she did not return to work until Tuesday, February 14. Doc. 22-1 at 61. Pitzing worked with restrictions that Tuesday and Wednesday but contracted a norovirus and missed work on Thursday and Friday. Doc. 22-1 at 61–62. She returned to work the

following week and continued to work through the end of February. Doc. 22-5 at 8.

## D. Termination

Before Pitzing injured her back, she had been planning a retreat for more than 150 employees at Protective Stadium on February 13. Doc. 22-5 at 7. While Pitzing was out of work for her injury, however, Larson and other coworkers took over the management of the retreat. Doc. 22-5 at 7. When reviewing the status of Pitzing's preparation, Larson determined that there were many action items that would need to be completed in a short period of time. Doc. 22-5 at 7. Pitzing disagrees with that assessment and offered that if Larson and the others "changed any of the things that I had done and worked with the other teams, that's on them." Doc. 22-1 at 65.

"Based on [Pitzing's] poor performance and failure to improve after multiple opportunities," Larson decided to terminate Pitzing's employment. Doc. 22-5 at 8. On March 1, 2023, Larson and a representative from the Human Resources Department met with Pitzing to terminate her employment for "unsatisfactory job performance." Doc. 22-1 at 64; Doc. 22-3 at 56–57; Doc. 22-4 at 6. The termination letter detailed Larson's concerns and mentioned their discussions about her work performance in November 2021, May 2022, and August 2022, as well as the November 2022 performance review and the January 2023 written counseling notice. Doc. 22-3 at 56–57. The termination notice also detailed Larson's dissatisfaction with Pitzing's planning of the February 2023 retreat. Doc. 22-3 at 57.

Pitzing did not agree with the items listed in her termination letter, questioned Larson during the meeting, and offered a written rebuttal. Doc. 22-1 at 64–65. Instead of termination, the Human Resources Department gave Pitzing the option to resign, which she did on March 15, 2023. Doc. 22-1 at 66; Doc. 22-3 at 59.

## III. DISCUSSION

Pitzing alleges violations of both Title VII and the FMLA. First, she contends that Larson created a gender-based hostile work environment in violation of Title VII. Second, she alleges interference and retaliation in violation of the FMLA. These claims do not survive summary judgment.

### A. Hostile Work Environment

A defendant is liable under Title VII if the employee has suffered discrimination on the basis of her gender and the discrimination created a hostile or abusive work environment. *Meritor Sav. Bank v. Vinson*, *FSB*, 477 U.S. 57 (1986). A plaintiff proves a gender-based hostile work environment by showing that (1) she is a member of a protected class, (2) she has been subjected to unwelcome harassment, (3) the harassment was based a protected characteristic (here, her gender), (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive work environment, and (5) her employer is responsible for the hostile environment. *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002). UAB contends

that Pitzing cannot establish that the alleged harassment was based on her gender.[5] Doc. 21 at 14–16. The court agrees.

To show that harassment relates to a plaintiff's gender, she must present evidence of harassment that a "reasonable person would consider to be . . . gender-related." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000). For example, conduct which "ridicules women or treats them as inferior" may constitute gender harassment. *Sims v. Montg. County Comm.*, 766 F. Supp. 1052, 1073 (M.D. Ala. 1991). Regardless of the nature of the alleged harassment, the plaintiff must prove that her gender was the underlying reason for the harassment. *Succar v. Dade County Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000) (holding that the "harassment of [plaintiff] was motivated not by his male gender, but rather by [the harasser's] contempt for [plaintiff] following their failed relationship; [Plaintiff's] gender was merely coincidental").

As evidence of gender-based harassment, Pitzing points to two of Larson's comments. First, on more than one occasion, Larson told her to "pick a better partner." Doc. 22-1 at 16. Pitzing believes that Larson made these comments because she was in a lesbian relationship and speculates that she would not have

[5] UAB also argues that Pitzing's allegations are not "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment" (Doc. 21 at 16–17) and that her "unreasonable failure to complain eliminates employer liability." Doc. 21 at 17–19. The court does not address these arguments since Pitzing has not established that the alleged harassment was based on a protected characteristic under Title VII.

made the comments to someone in a heterosexual relationship. Doc. 22-1 at 16. This is not enough to prove that Larson made the comment because of Pitzing's gender. *See Ashmore v. J.P. Thayer Co.*, 303 F. Supp. 2d 1359, 1369 (M.D. Ga. 2004) ("Although the evidence is disputed as to whether [the alleged harasser] was homosexual, this does not answer the question. The issue is whether his conduct was directed at Plaintiffs because they were male.").

Larson's comments were gender-neutral, both on their face and in the context in which she said them. Pitzing testified that Larson told her to "pick a better partner" when discussing Pitzing's divorce. Larson may have expressed her opinion that Pitzing should divorce her partner, but she did not link this opinion to Pitzing's gender in any way. Under these circumstances, Pitzing's subjective belief that Larson was insinuating she should pick a male partner or that Larson would not have made the comment if she was not in a lesbian relationship do not establish that the comment was based on her gender. *See United States v. Stein*, 769 F. App'x 828, 832 (11th Cir. 2019) (finding the plaintiff's statements insufficient to "create an issue of fact" because they "conveyed her subjective belief, not personal knowledge," and because "[b]elief, no matter how sincere, is not equivalent to knowledge") (quotation omitted).

Similarly, Larson's statement to Pitzing that she should "stop taking care of her children" (Doc. 22-1 at 17–18) is gender-neutral. At most, Larson's statement

conveyed her opinion that Pitzing should prioritize her work over her desire to assist her adult-aged children. This comment could just as easily have been directed at a man. Nothing about the statement relates to Pitzing's gender—it relates to her parenting decisions.

In sum, Pitzing has not produced any evidence from which a reasonable juror could infer that Larson's comments were based on her gender. Summary judgment will be granted on her gender-related hostile work environment claim.

## B. FMLA Claims

The FMLA "creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citing 29 U.S.C. §§ 2615(a)(1) & (2)). Pitzing brings both interference and retaliation claims.

### *1. Time-Barred Claims*

Before turning to the merits of Pitzing's claims, the court must address which allegations fall within the statute of limitations. The FMLA has two limitation periods. *See* 29 U.S.C. § 2617(c)(1)–(2). Generally, an employee must file an FMLA claim "not later than 2 years after the date of the last event constituting the

alleged violation for which the action is brought." *See* 29 U.S.C. § 2617(c)(1). When an action is "brought for a willful violation," however, it must be filed "within 3 years of the date of the last event constituting the alleged violation for which such action is brought." 29 U.S.C. § 2617(c)(2); *see also Hollis v. DeKalb County Sch. Dist.*, 2023 WL 3627896, at *5 (N.D. Ga. Mar. 20, 2023).

Pitzing's response brief addresses three separate periods of medical leave—one in 2019, one in 2020, and another in 2023. Doc. 26 at 10–11 & 28–29 (discussing her FMLA leave in 2019); Doc. 26 at 11–12 & 25 (discussing her breast cancer and double mastectomy in 2020); Doc. 26 at 12–13 & 29 (discussing her back injury in 2023). She filed her complaint on October 29, 2024. Doc. 1. Even assuming that the FMLA violations were willful, any FMLA claims based on events occurring in 2019 and 2020 are outside of the statute of limitations. The only protected activity that could support Pitzing's FMLA claims relates to her January 2023 back injury.

Accordingly, to the extent that Pitzing brings FMLA claims based on her 2019 and 2020 medical events, these claims are untimely and UAB's motion for summary judgment is due to be granted. The court's discussion below examines the remaining FMLA interference and retaliation claims relating to Pitzing's on-the-job back injury in 2023.

***2. Interference Claim***

It is unlawful "for any employer to interfere with, restrain, or deny the exercise

of or the attempt to exercise, any right provided by the FMLA." 29 U.S.C. § 2615(a)(1); *see also Pereda v. Brookdale Sr. Living Comm.*, Inc., 666 F.3d 1269, 1273–74 (11th Cir. 2012). "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied," *Strickland*, 239 F.3d at 1206–07, and that she "has been prejudiced by the violation in some way." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). For this reason, Pitzing's interference claim has two elements: (1) she was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010).

**a. Serious Health Condition**

An employee has the right to take FMLA leave for a variety of reasons, including when she suffers from a "serious health condition" that makes her "unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(D); *see also Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1166 (11th Cir. 2014). The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The FMLA does not define "continuing treatment by a health care provider," but the Department of Labor has issued a regulation explaining the phrase and listing examples of situations that meet

the continuing treatment requirement. 29 C.F.R. § 825.115. Relevant here, to qualify as "continuing," the treatment (1) must involve a period of incapacity of more than three consecutive, full calendar days; and (2) must require either (a) treatment by a healthcare provider at least twice within 30 days of the first day of incapacity or (b) treatment by a healthcare provider at least once that results in a regimen of continuing treatment under the supervision of the healthcare provider. 29 C.F.R. § 825.115(a)(1)–(2); *see also Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1242 (11th Cir. 2021). "The term incapacity means the inability to work . . . or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

Consistent with this standard, Pitzing has created a question of fact as to whether she suffered from a serious health condition that left her unable to perform the functions of her position after her back injury.[6] The record contains enough evidence for a reasonable juror to conclude that her injury involved a period of incapacity of more than three consecutive, full calendar days and that she received the required treatment by a health care provider. As for the period of incapacity requirement, Pitzing injured her back on Tuesday, January 31, and visited a doctor who returned her to work with restrictions. Doc. 22-3 at 44. As best the court can

[6] Pitzing's brief did not analyze this issue; she summarily claimed that her injury "was a serious health condition that required more than three days leave." Doc. 26 at 27. Regardless, the record before the court reflects a question of fact on this issue.

tell from the record, Pitzing worked on February 1 and part of February 2. *See* Doc. 22-3 at 46. And on the afternoon of February 2 she returned to the doctor, who restricted her from working until she could have an MRI. Doc. 22-3 at 45. There is nothing in the record about her condition over the weekend other than her text to Larson on Sunday, February 5, reporting that her back was "much, much better" and that she was "able to walk and be normal." Doc. 22-1 at 58; Doc. 22-3 at 46. Regardless of that statement, Pitzing was not permitted to work on February 3, 4, and 5 because of her doctor's restrictions. This is three consecutive calendar days. In addition, Pitzing experienced a back spasm at work on Friday, February 10, that forced her to leave for the day. Doc. 22-1 at 58–59. She did not return to work until Tuesday, February 14 with restrictions. Again, this break amounts to three consecutive calendar days during which Pitzing could not work.

Pitzing also received treatment more than twice within 30 days of the first day of incapacity. Treatment includes "examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.113(c). It is undisputed that Pitzing went to the doctor on February 1, 2, and 14 in connection with her back injury. Doc. 22-3 at 44–45 & 52. This is sufficient to support the treatment requirement.

For these reasons, the court concludes that Pitzing has created a question of fact as to whether she suffered from a serious health condition.

**b. Notice of Need for FMLA Leave**

An employee must give her employer notice of her need for leave, *see* 29 U.S.C. § 2612(e), and an interference claim requires proof of proper notice. *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1167 (11th Cir. 2014). When the need for leave is unforeseeable, as it was here, "the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason." *Gay v. Gilman Paper Co*., 125 F.3d 1432, 1436 (11th Cir. 1997). The notice does not have to be in writing, and the employee does not have to mention the FMLA when providing notice. 29 C.F.R. § 825.303(b).

The "critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Gay*, 125 F.3d at 1435 (internal quotation marks omitted). In other words, "the notice must simply allow the employer to understand that the employee potentially qualifies for FMLA rights." *Ramji*, 992 F.3d at 1243. "FMLA regulations offer examples of sufficient notice, such as providing information about the 'condition [that] renders the employee unable to perform the functions of the job' or 'the anticipated duration of the absence, if known.'" *Id*. (quoting 29 C.F.R. § 825.303(b)).

Pitzing meets the threshold requirements for notice that her injury potentially qualified for FMLA leave. Pitzing updated Larson on her injury and her physician's

orders. Doc. 22-1 at 61. Larson also knew that Pitzing had been to the physician twice within three days of the incident. Doc. 22-5 at 6–7. This put Larson on notice that Pitzing's injury potentially qualified her for FMLA leave.

After the employee gives notice, the burden shifts to the employer to inquire into whether the leave implicates the FMLA. *Ragsdale*, 535 U.S. at 87; *see also* 29 C.F.R. § 825.302(c) ("In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken."). Here, it is undisputed that Larson and Pitzing talked about whether Pitzing should file a workers' compensation claim (Doc. 22-1 at 57), but there is no evidence that Larson inquired into whether Pitzing's leave qualified under the FMLA. This failure "may constitute an interference with, restraint, or denial of the exercise of [her] FMLA rights." 29 C.F.R. § 825.300(e). But the inquiry does not end here.

**c. Prejudice or Harm**

Even if there are questions of fact about UAB's interference with Pitzing's rights under the FMLA, "a technical FMLA violation alone is not enough." *Ramji*, 992 F.3d at 1241. Pitzing "must also 'demonstrate some harm' from the alleged interference, and that harm must be 'remediable by either "damages' or 'equitable relief.'" *Id.* (quoting *Evans v. Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014)) (quoting in turn *Ragsdale*, 535 U.S. at 89). Specifically, the FMLA provides

for "compensatory damages equal to the amount of any wages, salary, employment benefits, or other compensation which she was denied or lost by reason of the violation; interest on the compensatory damages; and, unless the court concludes that the employer acted in good faith and reasonably believed it had complied with the Act, liquidated damages equal to the amount of compensatory damages plus interest." *McAnnally v. Wyn S. Molded Prods., Inc.*, 912 F. Supp. 512, 513 (N.D. Ala. 1996) (citing 29 U.S.C. § 2617(a)(1)(A)). The statutory scheme also provides for "equitable relief . . . including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B).

As evidence of harm, Pitzing points to an alleged "depriv[ation] of the opportunity to make an informed decision about her use of FMLA leave to which she was legally entitled." Doc. 26 at 27. This type of damage is not remediable under the FMLA. *See Evans*, 762 F.3d at 1296. And the record does not reflect any other damage to Pitzing resulting from the UAB's technical violation of the FMLA. UAB did not deny leave based on her injury and there is no evidence of any monetary loss due to the technical violation. *See Lapham v. Walgreen Co.*, 88 F. 4th 879, 896 (11th Cir. 2023) ("Lapham has not, for example, shown that she incurred expenses when obtaining transportation for her son to and from medical appointments on the days for which she had requested but was denied time off. Nor has she shown that she incurred expenses by rescheduling those appointments.").

Because Pitzing has not offered evidence of prejudice or harm that is remediable by damages or equitable relief, her interference claim does not survive summary judgment.

***3. Retaliation***

Pitzing also brings an FMLA retaliation claim. Under the FMLA, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). To establish an FMLA retaliation claim, an employee must show that her employer intentionally discriminated against her for exercising a right guaranteed under the FMLA. *Strickland*, 239 F.3d at 1207. Unlike an interference claim, an employee bringing a retaliation claim faces the increased burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id.* (quotations omitted). But like discrimination claims, claims of retaliation can be supported with either direct or circumstantial evidence. *Lapham*, 88 F.4th at 889.

Pitzing does not contend that she has direct evidence of retaliation. Instead, she attempts to make out a circumstantial case of retaliation using the *McDonnell Douglas* framework. The Eleventh Circuit recently explained the "roadmap" a court should follow "depending on whether the plaintiff can demonstrate a *prima facie* case or not." *Ismael v. Roundtree*, 161 F.4th 752, 764 (11th Cir. 2025). "If the

plaintiff can establish a *prima facie* case, she is entitled to a rebuttable presumption of illicit intent." *Id*. The defendant then must "come forth with evidence and successfully rebut the presumption." *Id*. If it does this,[7] the court then "proceed[s] to ask whether 'the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination . . . by the decisionmaker.'" *Id*. (quoting *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011)). "A showing of pretext (or lack thereof) would certainly be relevant. But a plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment." *Id*. (footnote added).

A plaintiff "does not automatically lose on summary judgment" if she cannot establish a *prima facie* case. *Id*. "Rather than lose by default, the consequence is that the plaintiff must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact. A court, therefore, should advance directly to the convincing mosaic inquiry." *Id*. at 965. Regardless of the method of proof, "the ultimate question in a [retaliation] case is whether there is enough evidence to show that the reason for an adverse employment action was illegal [retaliation]." *Tynes v. Fla. Dept. of Juv. Just*., 88

[7] "[I]f the defendant fails to proffer evidence of a legitimate reason for the adverse employment action, summary judgment in favor of the plaintiff is appropriate." *Id.* at 964.

F.4th 939, 941 (11th Cir. 2023).

To establish a *prima facie* case of FMLA retaliation, Pitzing must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) the action "was casually related to the protected activity." *Martin v. Brevard County Pub. Schs.*, 543 F.3d 1261, 1268 (11th Cir. 2008) (citing *Brungart v. BellSouth Telecomms.*, Inc., 231 F.3d 791, 798 (11th Cir. 2000)). "The third element requires a showing of but-for causation." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)); *Lapham*, 88 F.4th at 893–94 (holding that "the proper causation standard for FMLA . . . retaliation claims is but-for causation") (citation omitted).

"An employee engages in protected activity under the FMLA if he requests time off, or otherwise provides notice to his employer of his need to take time off, for a 'serious health condition.'" *Wood v. Gilman Bldg. Prods. Inc*, 769 F. App'x 796, 802 (11th Cir. 2019) (citation omitted). As discussed above, Pitzing created a question of fact as to whether she engaged in protected activity with respect to her serious health condition of an on-the-job back injury. She also suffered an adverse employment action when UAB terminated her employment.[8] But Pitzing has not proven a causal connection between these two events.

[8] To be precise, Pitzing resigned under threat of termination, but this does not affect the court's analysis.

Pitzing relies on temporal proximity to establish causation—her protected activity occurred from February 1 to 14, while Larson terminated her on March 1, less than one month after she returned. Doc. 26 at 29. But "given the standard is but-for causation, temporal proximity is not necessarily sufficient." *Johnson v. Phoebe Putney Health Sys. Inc.*, 2026 WL 880147, at *13 (M.D. Ga. Mar. 31, 2026). "[B]ut-for causation is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020); *see also Comcast Corp. v. Nat. Assoc. of African Am.-Owned Media*, 589 U.S. 327, 331 (2020) (explaining that a plaintiff must "demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred"). "The but-for test 'directs [the court] to change one thing at a time and see if the outcome changes.' If it does, the isolated factor is a but-for cause." *Lapham*, 88 F.4th at 894 (quoting *Bostock*, 590 U.S. at 656).

The evidence here does not permit a reasonable juror to conclude that Pitzing's leave for her on-the-job back injury was the but-for cause of her termination. There is no dispute that UAB terminated her employment less than one month after she took leave, but Pitzing has not established that she would not have been fired if she had not taken leave. Instead, the record reflects Larson's dissatisfaction with Pitzing's performance well before her injury. Larson began noticing issues with Pitzing's work no later than May 2022 and contemporaneously

documented her concerns in May, August, and early September of 2022. Doc. 22-3 at 17–18, 25–26. And even though Pitzing denies that Larson initially discussed these concerns with her, she admits that she met with Larson on September 28, 2022, for her performance review, during which Larson outlined numerous deficiencies in her work. Doc. 22-1 at 50; Doc. 22-3 at 28. And Larson again counseled Pitzing the day before she injured herself on the job. Doc. 22-3 at 42.

"[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). Pitzing's performance was not up to Larson's standards before her need to take leave, and Larson's examination of her preparation for the February 2023 conference reinforced her dissatisfaction with Pitzing's work. Because Pitzing has offered no evidence of causation other than timing, she cannot show that her leave was the but-for cause of her termination. Her *prima facie* case fails for this reason.

Pitzing may still succeed, however, if she offers evidence of a convincing mosaic of retaliation under the FMLA. *See Ismael*, 161 F.4th at 965. She has not. Other than temporal proximity, there is nothing connecting Pitzing's leave with her termination. All of the evidence before the court reveals that Pitzing's termination

resulted from her inability to accomplish her job duties in the manner Larson expected. While Pitzing disagrees with Larson's evaluations of her job performance, that disagreement does not prove that the reason for an adverse employment action was illegal retaliation. *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (holding that "an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence"). There is no competent evidence in the record that UAB terminated Pitzing because of her leave. Accordingly, summary judgment is due to be granted in UAB's favor on Pitzing's retaliation claim.

## IV. CONCLUSION

For these reasons, the Motion for Summary Judgment (Doc. 20) is due to be granted. A separate final order will be entered.

DONE and ORDERED on September 10, 2026.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE